RECEIVED

JUL - 1 2020

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **TERESA WATFORD**, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>**ALL IN CREDIT UNION,**<br><br>    Defendant. | Case No. _1:20-cv-461-RAH-SMD_<br>Case No. _____<br>**DEMAND FOR JURY TRIAL**<br>**CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiff Teresa Watford ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding herself and on information and belief as to others.

### INTRODUCTION

1. Plaintiff brings this action on behalf of herself and a class of all others similarly situated against Defendant All In Credit Union ("All In") over the improper assessment and collection of Overdraft Fee charges ("Overdraft Fees") through practices that are in breach of All In's contracts and its duty of good faith and fair dealing.

2. All In charges accountholders $28 per Overdraft Fee on accounts that were never actually overdrawn.

1

3.      Through the imposition of these fees, All In has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue. Plaintiff, like thousands of others, has fallen victim to All In's Overdraft Fee revenue maximization scheme.

4.      Plaintiff, on behalf of herself and all others similarly situated, brings this action for damages and other relief arising from All In's routine practice of assessing Overdraft Fees on transactions that did not overdraw checking accounts.

**PARTIES, JURISDICTION, & VENUE**

5.      Plaintiff Teresa Watford is a citizen and resident of Alabama.

6.      Defendant All In is a credit union with approximately $1.6 billion in assets. All In is headquartered in Daleville, Alabama and maintains twenty-two branch locations across Alabama, and four branch locations in Florida.

7.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and based upon information and belief, at least one member the proposed Classes is a citizen of a different state than All In.

8.      Venue is proper in this District pursuant to § 28 U.S.C. § 1391 because All In is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**FACTS**

I.      **ALL IN ASSESSES OVERDRAFT FEES ON TRANSACTIONS THAT DO NOT OVERDRAW THE ACCOUNT**

9.      Plaintiff has a checking account with All In and opted into All In's standard overdraft practices. Exs. A-C.

10.     Pursuant to its "Agreements and Disclosures" document ("Account Agreement"), attached hereto as Exhibit A; the "What You Need to Know About Overdrafts and Overdraft Fees" document ("Opt-In Form"), attached hereto as Exhibit B; and the Fee Schedule, attached hereto as Exhibit C (collectively the "Account Documents"), All In charges Overdraft Fees (currently in the amount of $28) for transactions that overdraw an account.

11.     Plaintiff's checking account with All In was at all relevant times governed by All In's Account Documents, which are standardized form contracts for deposit accounts, the material terms of which are drafted by All In, amended by All In from time to time at its convenience and complete discretion, and imposed by All In on all of its deposit account customers.

12.     All In's Account Agreement promises that All In will only assess Overdraft Fees "if a share draft is presented for payment and the amount of such share draft exceeds the fully paid and collected share balance in this account . . ." Ex. A at 3 and 4.

13.     Pages 14 and 15 of the Account Agreement contain a section titled "Discretionary Overdraft Privilege Policy." ("Overdraft Policy"). The Overdraft Policy promises that All In will only assess Overdraft Fees "if you inadvertently overdraw your account," that All In "is not obligated to pay any item presented for payment if your account does not contain sufficient available funds," and that All In "authorizes and pays transactions using the available balance in your account." Ex. A at 14.

14.     According to the Opt-In Form:

An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Ex. B.

3

15.     The meaning of key terms such as "fully paid and collected share balance," "presented for payment," "posted," "sufficient available funds," "enough money," "to pay," and "to cover" are not defined or explained.

16.     In breach of these promises, All In assesses Overdraft Fees on transactions that do *not* overdraw the account.

**A.      Plaintiff's Transactions**

17.     On May 8, 2015, All In charged Plaintiff a $28 Overdraft Fee on a $1.99 payment to Google.

18.     On March 3, 2015, All In charged Plaintiff a $28 Overdraft Fee on a $102.75 payment to Grocery Outlet.

19.     That same day, March 3, 2015, All In charged Plaintiff another $28 Overdraft Fee on a $102.60 transaction with Eclipse Cash Systems.

20.     According to All In's own statements, Plaintiff had "enough money in'[the] account to cover" all of these transactions. In other words, the amount of the transactions did not "exceed[]" the fully paid an collected share balance in [the] account."

21.     Nevertheless, All In improperly assessed Plaintiff Overdraft Fees on each of these transactions anyway.

22.     Because Plaintiff had "enough money in [the] account to cover" each of these transactions, under the terms of the Account Documents, they did not overdraw her account and could not incur an Overdraft Fee.

23.     All In thus breached its Account Documents by charging Overdraft Fees on these transactions.

**II.   ALL IN ALSO ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE PREVIOUSLY AUTHORIZED ON SUFFICIENT FUNDS**

**A.    Overview of the Claim**

24.    Plaintiff brings this action challenging All In's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

25.    Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, All In immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because All In has already sequestered the funds for payment.

26.    However, All In still assesses crippling $28 Overdraft Fees on many of these transactions and mispresents its practices in its Account Documents.

27.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, All In later assesses Overdraft Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

28.    All In maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, All In sequesters the funds needed to pay the transaction, subtracting the dollar amount of

the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

29.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

30.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur Overdraft Fees due to the unavailability of the funds sequestered for earlier debit card transactions.

31.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, All In improperly charges Overdraft Fees on APSN Transactions.

32.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers

likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

33. There is no justification for these practices, other than to maximize All In's Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But All In is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But All In was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

34. Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in All In's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of All In's processes and practices. All In also exploits its contractual discretion by implementing these practices to gouge its customers.

7

35.    In plain, clear, and simple language, the Account Documents promise that All In will only charge Overdraft Fees on transactions if there are insufficient funds in the account to cover those transactions.

36.    All In is not authorized by contract to charge Overdraft Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.    Mechanics of a Debit Card Transaction**

37.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from All In. When a customer physically or virtually "swipes" a their debit card, the credit card terminal connects, via an intermediary, to All In, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

38.    At this step, if the transaction is approved, All In immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

39.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

40.    All In (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that All In may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it

8

"must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

41.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

### C.     All In's Account Documents and APSN Transactions

42.     The Account Documents provide that All In will not charge Overdraft Fees on transactions that have sufficient funds to cover them at the time they are initiated.

43.     All In's Account Agreement promises that All In will only assess Overdraft Fees "if a share draft is presented for payment and the amount of such share draft exceeds the fully paid and collected share balance in this account . . ." Ex. A at 3 and 4.

44.     All In's Overdraft Policy promises that All In will only assess Overdraft Fees "if you inadvertently overdraw your account," that All In "is not obligated to pay any item presented for payment if your account does not contain sufficient available funds," and that All In "authorizes and pays transactions using the available balance in your account." Ex. A at 14.

45.     Likewise, the Opt-In Form promises that:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Ex. B.

46.     Furthermore, the Account Agreement promises that All In will place holds on funds required to pay debit card transactions at the time of authorization. Such holds reduce the account's available balance and therefore cannot be applied to other, later-made transactions.

> All In Credit Union will place a hold on your account for any authorized debit card transaction until the transaction settles (usually within two business days) or as permitted by payment system rules. In some cases, the hold may exceed the amount of the transaction. When the hold ends, the funds will be added to the available balance in your account. If your account is overdrawn after the held funds are added

9

to the available balance and the transaction is posted to the available balance, an Overdraft Fee may be assessed.

Ex. A at 15.

47.     All In's decision to "cover" or "pay" a transaction necessarily occurs at the moment of authorization.

48.     Indeed, All In promises that overdrafts are determined at the moment it "authorizes and pays" a debit card transaction:

> What are the standard overdraft practices that come with my account?
>
> We do authorize and pay overdrafts for the following types of transactions:
> - Checks and other transactions made using your checking account number
> - Automatic bill payments
>
> We will not authorize and pay overdrafts for the following types of transactions without your consent:
> - ATM transactions
> - Everyday debit card transactions
>
> We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction.
>
> If we do not authorize and pay an overdraft, your transaction will be declined.
> . . .
>
> What if I want All In Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions?
>
> If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call . . .
>
> _____   I do not want All in Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions.
>
> __X__   I want All In Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Ex. B.

49.     The Opt-In Form explicitly links payment and overdrafts to authorization *eight times*. *See id.*

50.     For APSN Transactions, for which funds are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet All In assesses Overdraft Fees on them anyway.

51.     The above promises indicate that transactions are only overdraft transactions when they are "authorized and paid" into a negative account balance. Of course, that is not true for APSN Transactions.

52.     All In charges Overdraft Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any Account Document states that All In may impose Overdraft Fees on any APSN Transactions.

53.     The Account Documents also misconstrue All In's true debit card processing and overdraft practices.

54.     First, and most fundamentally, All In charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover the transactions throughout their lifecycle.

55.     All In's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between All In's actual practice and the Account Documents causes consumers like Plaintiff to incur more Overdraft Fees than they should.

56.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

57.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what All In does when it re-debits the account during a secret batch posting process.

58.     In reality, All In's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time of authorization and later at the time of settlement.

59.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into positive funds. As such, All In cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

60.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, All In releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

61.     This secret step allows All In to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which All In specifically set aside money to pay them.

62.     In sum, there is a huge gap between All In's practices as described in the Account Documents and All In's actual practices.

63.     Banks and credit unions like All In that employ this abusive practice require their accountholders to expressly agree to it—something All In here never did.

64.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee is such circumstances is counterintuitive to accountholders,

financial institutions generally provide express warnings that APSN fees can occur, and explanations and examples of how such fees occur. These institutions therefore require their accountholders to authorize them to charge Overdraft Fees in such circumstances.

65.     For example, Bank of America's deposit agreement states:

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction. . . . If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant.** . . .

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

*Deposit   Agreement   and   Disclosure*,   Bank   of   America   18   (Nov.   1,   2019),

https://www.bankofamerica.com/deposits/resources/deposit-agreements.go (emphasis added).

66.     As another example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn.  The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60.  As a result, your available balance will be reduced by $60 so your available balance is only $40.  Your actual balance is still $100.  Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

13

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://cdn.
canvas.org/files/content/pdf/MSA_Part_2-CanvasCU-Std_Size-11-05-19.pdf   (emphases   in
original).

67.     Capital One's deposit agreement similarly states:

Other intervening transactions that occur while authorized debit card transactions
are pending may create overdrafts on your account. Here is an example of how that
could happen:

You're enrolled in our optional overdraft service. Your account balance is $100.00.
On Monday, you go to the store and use your debit card to make a purchase for
$80.00. We authorize the transaction; however, the merchant doesn't send us the
transaction for payment and posting to your account on that day. On Tuesday, you
withdraw $30.00 from an ATM, reducing your account balance to $70. **On
Wednesday, the merchant requests payment for the $80.00 transaction
authorized on Monday, and you're charged a fee because the balance in your
account is insufficient to pay the transaction at that time**.

*Rules Governing Deposit Accounts*, Capital One (Nov. 7, 2018), https://www.capitalone.com/
bank/rules-governing/disclosures/ (emphasis added).

68.     All In and its accountholders make no such agreement. The Account Documents
thus mislead and deceive accountholders.

>    **D.     Reasonable Consumers Understand Debit Card Transactions Are Debited
>            Immediately**

69.     All In's assessment of Overdraft Fees on transactions that have not overdrawn an
account is inconsistent with immediate withdrawal of funds for debit card transactions. This is
because if funds are immediately debited, they cannot be depleted by intervening, subsequent
transactions. If funds are immediately debited, they are necessarily applied to the debit card
transactions for which they are debited.

70.     All In was and is aware that this is precisely how its accountholders reasonably
understand debit card transactions work.

71.     All In knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

72.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?* Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card=.

73.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Cash for Smallest Purchases*, MarketWatch (Mar. 23, 2016), http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

74.     Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

75.     All In was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Account Documents only support this perception.

**E. Plaintiff Was Assessed an Overdraft Fee on Debit Card Transactions Previously Authorized on Sufficient Funds**

76. On May 8, 2015, Plaintiff was assessed a $28 Overdraft Fee on a $1.99 transaction with Google that settled that same day. According to bank statements produced by Defendant, this transaction was previously authorized on sufficient funds.

77. Also on May 8, 2015, Plaintiff was assessed a $28 Overdraft Fee on a $4.99 transaction with Google that settled that same day. According to bank statements produced by Defendant, this transaction was previously authorized on sufficient funds.

78. Contrary to All In's Account Documents, the Overdraft Fees were charged even though Plaintiff's account was not overdrawn because the account had "sufficient available funds to pay" or "to cover" the transaction. In other words, the amount of the transaction did not "exceed[] the fully paid an collected share balance in [the] account." Ex. A at 3; Ex. B.

79. The improper fees charged by All In were also not "errors" by All In, but rather were intentional charges made by All In as part of its standard processing of transactions.

80. Plaintiff therefore had no duty to report the fees as "errors" because they were not "errors," but were systematic and intentional fees assessed according to All In's standard practices.

81. Moreover, any such reporting would have been futile as All In had made a decision to charge the fees in this specific manner to maximize profits at the expense of customers.

**II. THE IMPOSITION OF OVERDRAFT FEES THAT DO NOT OVERDRAW THE ACCOUNT BREACHES ALL IN'S DUTY OF GOOD FAITH AND FAIR DEALING**

82. Parties to a contract are required not only to adhere to the express terms of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to

16

enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

83.     Here—in the adhesion agreements All In foisted on Plaintiff and its other customers—All In has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, All In abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged Overdraft Fees on transactions that do not actually overdraw the account.

84.     All In exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. All In also abuses the power it has over customers and their accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of All In's implied covenant to engage in fair dealing and to act in good faith.

85.     Further, All In maintains complete discretion not to assess fees at all. See Ex. A at 3 ("if a share draft is presented for payment and the amount of such share draft exceeds the fully paid and collected share balance in this account, the Credit Union *may* assess this account a charge …") (emphasis added). Instead, All In *always* charges these fees, including on transactions that do not overdraw the account. By always exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers, All In breaches the reasonable expectations of Plaintiff and other customers and, in doing so, violates its duty to act in good faith.

86.     It was bad faith and totally outside Plaintiff's reasonable expectations for All In to use its discretion in this way.

87.     When All In charges improper fees in this way, All In uses its discretion to define the meaning of key terms such as "sufficient available funds," "enough money," "cover," and "pay" in an unreasonable way that violates common sense and reasonable consumers' expectations. All In uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more Overdraft Fees.

## CLASS ALLEGATIONS

88.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of Rule 23.

89.     The proposed Class is defined as:

All persons who, during the applicable statute of limitations period through the date of class certification, were charged Overdraft Fees on transactions that did not overdraw an account.

90.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

91.     Excluded from the Class are All In, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns; any entity in which All In has a controlling interest; all customers members who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

92.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identities of whom are within the exclusive knowledge of All In and can be ascertained only by resort to All In's records.

18

93.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all members of the Class, was charged Overdraft Fees on transactions that did not actually overdraw her account. Plaintiff, like all members of the Class, has been damaged by All In's misconduct in that she has been assessed unlawful Overdraft Fees. Furthermore, the factual basis of All In's misconduct is common to all members of the Class and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Class. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Class.

94.    The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because All In has acted on grounds generally applicable to the Class.

95.    Among the questions of law and fact common to the Class include:

    a.    Whether All In violated its Account Documents by charging Overdraft Fees on transactions that did not overdraw an account;

    b.    Whether All In breached its covenant of good faith and fair dealing with Plaintiff and other members of the Class through its Overdraft Fee policies and practices;

    c.    The proper method or methods by which to measure damages; and

    d.    The declaratory and injunctive relief to which the Class is entitled.

96.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and All In's misconduct will proceed without remedy.

97. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

98. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

99. Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Class, is at risk of additional Overdraft Fees on transactions that did not overdraw an account. Plaintiff and the Class are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain All In from continuing to commit its illegal actions.

## CAUSE OF ACTION
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Class)

100. Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

101.   Plaintiff and All In have contracted for bank account services, as embodied in All In's Account Documents. Exs. A-C.

102.   All contracts entered by Plaintiff and the Class are identical or substantively identical because All In's form contracts were used uniformly.

103.   All In has breached the express terms of its own agreements as described herein.

104.   Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Account Documents.

105.   Under Alabama law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

106.   Good faith and fair dealing, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

107.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

108.   All In abused the discretion it granted to itself when it charged Overdraft Fees on transactions that did not overdraw an account.

109.   All In also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

110.    In these and other ways, All In violated its duty of good faith and fair dealing.

111.    All In willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

112.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

113.    Plaintiff and members of the Class have sustained damages as a result of All In's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

114.    Plaintiff and the members of the class are entitled to injunctive relief to prevent All In from continuing to engage in the foregoing conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

a.    certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class counsel;

b.    declaring All In's Overdraft Fee policies and practices alleged in this Complaint to be wrongful and unconscionable;

c.    enjoining All In from engaging in the practices outlined herein;

d.    awarding Plaintiff and the Class restitution in an amount to be proven at trial;

e.    awarding actual damages in an amount according to proof;

f.    awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g.    awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h.     awarding such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by a struck jury.

Dated: June 30, 2020

Respectfully submitted,

F. Jerome Tapley
ASB-0583-A56T
Hirlye R. "Ryan" Lutz, III
ASB-6641-E59L
Taylor Pruett
ASB- 9085-T65W
**CORY WATSON, P.C.**
2131 Magnolia Ave. S., Suite 200
Birmingham, AL 35205
Telephone: (205) 271-7112
jtapley@corywatson.com
rlutz@corywatson.com
tpruett@corywatson.com

Lynn A. Toops
IN Bar No. 26386-49*
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV
TN Bar No. 23045*
Martin F. Schubert
TN Bar No. 35313*
**BRANSTETTER, STRANCH & JENNINGS,
PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801

23

gerards@bsjfirm.com
martys@bsjfirm.com

* *Pro Hac Vice* applications submitted

*Counsel for Plaintiff and the Proposed
Class*